IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| EARTHLINK, INC., : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | CIVIL ACTION NO. |
| : | 1:03-CV-2559-JOF |
| ANDY POPE; SCOTT MASLOWE; : | |
| FRED LUSKY; NETBENDERS, LLC, : | |
| a Michigan limited liability company; : | |
| ISN, LLC, a Michigan limited liability : | |
| company; and JOHN DOES 17-50, : | |
| a/k/a the Alabama Spammers, : | |
| : | |
| Defendants. : | |

**OPINION AND ORDER**

This matter is before the court on Defendants' motion to compel arbitration [119-1]; Defendants' motion to dismiss [119-2]; Defendant Pope's amended motion to dismiss [133-1]; Defendant Pope's motion for sanctions [134-1]; Plaintiff's motion to strike Defendant Pope's motion for sanctions [135-1]; Plaintiff's motion to strike Defendant Pope's motion to dismiss [136-1]; and Defendant Pope's amended motion for sanctions [141-1].

AO 72A
(Rev.8/82)

**I.     Background**

    **A.     Procedural History**

Plaintiff, EarthLink, Inc., filed suit against various Defendants on August 27, 2003, alleging violations of federal civil RICO laws; the Electronic Communications Privacy Act; the Computer Fraud and Abuse Act; the Lanham Act, including unfair competition and dilution of famous mark; Georgia civil RICO law; Georgia Computer Systems Protection Act; Georgia unfair competition; deceptive trade practices; misappropriation of computer resources; conversion; trespass; and unjust enrichment. Defendants filed motions to dismiss which raised both subject matter and personal jurisdiction concerns. In an order dated February 1, 2005, the court dealt with the various jurisdictional issues raised by Defendants. The court directed the parties to conduct additional jurisdictional discovery and held a hearing on May 5, 2005, which included testimony from Plaintiff's chief fraud investigator. Since that time, numerous defendants have been dismissed from the case including Defendants PBMS, LLC, a/k/a Pathing Networks, Inc., Herbal Groups, Inc., and Pat Galvin, collectively known as the "Herbal Defendants." The only named Defendants remaining in the case are Scott Maslowe, Fred Lusky, NetBenders, LLC, ISN, LLC, and Andy Pope. On September 22, 2005, Plaintiff filed a Second Amended Complaint which relates only to these Defendants. Plaintiff's Second Amended Complaint is verified by Mary Youngblood, Abuse Team Manager at EarthLink, Inc.

    **B.     Second Amended Complaint**

2

An individual can sign up for an EarthLink account over the phone or at EarthLink's web page. *See* Second Amended Complaint, ¶ 16(a). In order to receive an account, the individual must accept the terms of EarthLink's Internet Service Agreement. *Id.* Using the phone link connected to his computer modem, a user dials the access number of an EarthLink Point of Presence ("POP") which is usually a toll-free or local number. *Id.*, ¶ 16(c). The POP contains various pieces of hardware including routers and servers. *Id.* When the user dials into an EarthLink POP, he provides his unique user name and password. *Id.*, ¶ 16(d). The POP verifies this information through EarthLink's central account database using Remote Authentication Dial-In User System ("RADIUS"). *Id*. After verification, the POP assigns the computer a "dynamic IP address" that remains valid until the user logs off. *Id.*, ¶ 16(e).

From October 2002 through at least May 2003, Defendants "used fictitious and stolen names and social security numbers and fraudulently-obtained credit/debit cards to 'purchase' at least one hundred EarthLink accounts, which were then used . . . to send illegal spam e-mails." *Id.*, ¶ 27. Defendants registered a form of credit card know as a "gift card" with the issuing bank using "fictitious names and social security numbers" or actual names and social security numbers of innocent third parties. *Id.* These accounts were then used to send spam to Internet users, including EarthLink subscribers. *Id.*, ¶ 28. In order to establish these accounts, Defendants either "(a) contacted EarthLink's Georgia offices via telephone, or (b) accessed the Georgia computer systems used by EarthLink for online account creation." *Id.*, ¶ 29. Defendants "accessed EarthLink's Georgia network using collocated computer

3

equipment and subleased telephone lines at WWISP, a Birmingham, Alabama ISP." *Id.*, ¶ 32. Each time Defendants used a dial-up connection, it involved access to and authentication by EarthLink's Georgia computer network. *Id.*, ¶ 33. Some of the spam sent by Defendants went "directly through" EarthLink's Georgia e-mail servers so that Defendants' true identities would be hidden and that the spam would appear to have originated with EarthLink. *Id.*, ¶¶ 34-35. Undeliverable e-mails would then be returned to EarthLink's own mail servers because an EarthLink IP address had falsely been presented as the point of origin. *Id.*, ¶ 39. Mr. Erb Avore testified that Defendants were able to send approximately 8 billion e-mails through EarthLink. *Id.*, ¶ 42.

In September 2002, EarthLink initiated an investigation which showed significant amounts of spam originating in Birmingham, Alabama. *Id.*, ¶ 43. The investigation showed that the e-mails were sent from dial-up connections near Birmingham using a handful of Birmingham telephone numbers. *Id.* The EarthLink accounts were purchased with credit card numbers starting with the same nine digits. *Id.* EarthLink increased its fraud efforts and implemented increased monitoring on dial-ups from Birmingham. *Id.*, ¶¶ 47-48.

EarthLink's "Network Operations Center" is located in Atlanta, Georgia. *Id.*, ¶ 57. The operations center houses EarthLink's "network of computers and equipment necessary for the provision of e-mail and Internet service to its customers and users." *Id.* "Each and every above-described log-in request by the Netbenders Defendants necessarily involved access to EarthLink's Georgia" operations center. *Id.*, ¶ 59. Due to the volume of spam sent by

4

Defendants, "significant" e-mails were targeted to Georgia Internet users and "necessarily resulted" in sales to Georgia residents. *Id.*, ¶ 63. Defendant Pope acquired the EarthLink accounts used to send the spam. *Id.*, ¶ 65. Defendants contracted with EarthLink for at least 100 separate accounts during the eight-month duration of their spam operation. *Id.*, ¶ 67.

### C.    Other Evidence

#### 1.    Mary Youngblood

Mary Youngblood, EarthLink's Abuse Team Manager, testified at the court's May 5, 2005 jurisdictional hearing. Ms. Youngblood described the general method that her group employs in investigating spamming complaints. She also stated that if an EarthLink subscriber in Alabama used a dial-up modem to access his EarthLink account, the transmission would be sent to Georgia for verification. *See* Transcript, at 6. Her group traced spam complaints by looking at the IP address in the header of the spam e-mail and then looking through EarthLink's RADIUS logs which show when someone dials up to the Internet. *Id.* at 9. The RADIUS log often contains the phone number of the individual dialing in and the phone number of the POP that the individual used to dial into. *Id.* at 9-10. Ms. Youngblood explained that the Defendants also used "dynamic DNS" so that it appeared that Defendants' website was being hosted on EarthLink's IP address. *Id.* at 15. This resulted in complaints coming to EarthLink. *Id*. She also verified that no matter what manner in which a person signs up for an EarthLink account, either through phone line or through computer transmission, information reaches into Georgia. *Id.* at 18.

She further stated that Defendants' system:

did what we call an asynchronous route. It would send the request from the highspeed modem, which is their server, sits in their facility. It sends that request to the recipient's e-mail service, but it pretends to be EarthLink.

So it uses that dial-up IP address that they've just procured from EarthLink, and it says I'm not this highspeed server, I'm EarthLink, and it says hello, how are you, and the recipient's mail server says I'm fine, what do you want, and the server says I want to send your customer some mail.

. . . .

That request from the recipient's mail server goes back to the EarthLink IP address. So it's sent to EarthLink, and then EarthLink routes that request to the person sitting at the end of that IP address, which is the server.

Then that server sends out the request to the highspeed modem, but it gets the answer through the dial-up modem, through us.

So it uses the EarthLink network to make that conversation with that mail server, the recipient's mail server possible, but it does that to hide the identity of the server.

*Id.* at 19-20.  Ms. Youngblood also testified that she was "aware of samples of spam that shows an EarthLink customer was the recipient of the Alabama spam gang mail." *Id.* at 21.

6

        2.     <u>Andy Pope</u>

Plaintiff also took the deposition of Defendant Andy Pope who appears *pro se*. Mr. Pope testified that he entered into contracts on NetBenders' behalf with WWISP, an Alabama internet service provider, in July 2002 for network access and server collocators. *See* Pope Depo., at 28, 32-33. He has also described himself as NetBenders' Director of Engineering in those contracts. *Id.* Fred Lusky and Scott Maslowe knew that Mr. Pope was going to sign those contracts on NetBenders' behalf. *Id.* at 33. Mr. Pope, Mr. Lusky, and Mr. Maslowe all had access to NetBenders' equipment at WWISP. *Id.* at 37. The three decided to use a dial-up system because a service provider like EarthLink would recognize if too many e-mails were coming from the same ISP and would block the ISP address. *Id.* at 39-40. WWISP would send its bills for NetBenders to Mr. Pope's post office box in Jackson, Tennessee. *Id.* at 97-98. They had one common computer that was linked between Mr. Pope's operations and those of Mr. Maslowe and Mr. Lusky. *Id.* at 107. Mr. Pope would receive the EarthLink account names and passwords from Mr. Avore and then share them on the one computer with Mr. Maslowe and Mr. Lusky. *Id.* at 108. Mr. Pope testified that because the three got their EarthLink accounts from Mr. Avore, none of them knew that those EarthLink accounts had been fraudulently obtained by Mr. Avore. *Id.* at 86-87. He also affirmed that Mr. Maslowe and Mr. Lusky would pull accounts from the same group provided by Mr. Avore, although Mr. Pope asserted that his business dealings were separate from those of Mr. Maslowe and Mr. Lusky. *Id.* at 94.

The relationship between Mr. Pope and NetBenders is further illuminated during one exchange:

Q: Did there come some point in time when NetBenders closed its Tennessee office?
A: If you mean did *I* stop doing anything at WWISP from Tennessee, yeah.

*See* Pope Depo., at 138 (emphasis added). Mr. Pope also testified that he signed a contract for NetBenders and put Mr. Maslowe's name on the contract as a technical contact to assure that Mr. Maslowe and Mr. Lusky would have access to the network. *Id.* at 142. "I never considered myself an agent for NetBenders. All I did was put a deal together and included my two friends in it and we agreed to share it equally. Whether it was called NetBenders, whether it was called whatever, it was irrelevant as far as I was concerned." *Id.* at 143. He later stated, "[i]t was just me and friends doing things. You call it NetBenders. I call it me and my friends." *Id.* at 145-46. NetBenders received correspondence at Mr. Pope's Tennessee post office box. *Id.* at 145. After Mr. Pope received a call from EarthLink's counsel in February 2003 concerning the spamming originating in Alabama, Mr. Pope called Mr. Maslowe and Mr. Lusky, and they all agreed to stop the e-mail. *Id.* at 152.

Finally, during Mr. Pope's deposition, the parties agreed to a stipulation that Fred Lusky, Scott Maslowe, NetBenders, and ISN were using EarthLink accounts to assist in the sending of commercial e-mail from the WWISP facility. At least some portion of those e-mails was unsolicited. *See* Pope Depo., at 80-81 (for purposes of personal jurisdiction only,

8

stipulation that "Lusky, Maslowe, NetBenders and ISN used EarthLink accounts to send commercial e-mail from their network at WWISP to other internet users using EarthLink and Mindspring users.  Although Lusky, Maslowe and NetBenders and ISN expressly deny that these e-mails were unsolicited, they agree for the sole purpose of this Court's determination of jurisdiction not to contest EarthLink's contention that some portions were unsolicited.").

### 3. Cameron McCormick

Defendants provide the sworn statement of Cameron McCormick, a senior engineer with Unified USA, a nationwide dial-up provider. Mr. McCormick states that RADIUS, or Remote Authentication Dial-In User Service, is a centralized authentication system for remote dial-up access systems. Mr. McCormick explains that because authentication is centralized, a "user can connect to a local access point and have its internet infrastructure issue an authentication request to a central authentication server. This action is carried out before the user has a 'live' internet connection." Thus, Mr. McCormick asserts, if a dial-up connection is made to an Internet service provider in the state of Florida, the connection is handled by a local office in Florida, and the dial-up connection remains in the state of Florida.

### D.     Contentions

Plaintiff contends that the court may exercise personal jurisdiction over Defendants under any of three theories:  (1) that for accounts opened prior to December 10, 2002, Defendants consented to a state or federal forum in Georgia pursuant to the EarthLink membership agreement, (2) Defendants are subject to jurisdiction in Georgia for torts committed in Georgia committed by them or their agents  (an "electronic contacts" theory), or (3) pursuant to the "effects test" outlined by the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984).

In lieu of an answer, the NetBenders Defendants filed the instant motion to dismiss for lack of personal jurisdiction or in the alternative to compel arbitration.  Defendants argue that Plaintiff has not shown a substantial amount of unsolicited e-mail directed from Alabama to Georgia.  Defendants also contend that Plaintiff has not shown that any e-mails from Defendants actually reached Georgia via the Remote Authorization Dial-In User Service ("RADIUS") system.  Finally, Defendants argue that *Calder* does not apply to the circumstances here because Defendants' actions did not have any contact with the Georgia forum.

10

## II.   Discussion

### A.   Personal Jurisdiction

The parties have briefly addressed the applicability of a forum selection clause in the membership agreement an individual is required to consent to before becoming a subscriber to EarthLink. Plaintiff contends that the forum selection clause in the agreement gives this court personal jurisdiction over Defendants through a forum selection clause. Defendants respond that they did not sign any of the EarthLink membership agreements. In the alternative, Defendants argue that if they had signed the membership agreements, the binding arbitration clauses of the agreement would require that this action be dismissed in favor of proceedings before the American Arbitration Association. The court recognizes the testimony of Ms. Youngblood and assumes for the purposes of this motion that any individual who creates an account must pass through a screen which requires acceptance of these membership terms. However, Mr. Pope testified that Defendants did not themselves sign up for the EarthLink accounts. Rather, Mr. Avore signed up for the accounts and simply gave Defendants the user name and passwords for those accounts. Because that is the only testimony currently before the court, the court will not further address the membership agreements at this time.[1]

---

[1] The court notes this apparent dispute of fact for the purposes of discussing personal jurisdiction only. The court recognizes that further information may develop on this point during substantive discovery.

The court addressed in its February 1, 2005 order the legal framework for issues of personal jurisdiction. To review, in *Carekeeper Software Development Co. v. Silver*, 46 F. Supp. 2d 1366 (N.D. Ga. 1999) (Forrester, J.), this court noted first that a federal court must have both statutory and constitutional authority to assert jurisdiction over a defendant. The court determined that Georgia's long-arm statute is coterminous with constitutional due process, thus, limiting the jurisdictional inquiry to constitutional issues. *Id.* at 1369; *see also Innovative Clinical & Consulting Services, LLC v. First National Bank of Ames*, 279 Ga. 672, 673 (Ga. 2005) (noting that subsection 2 of O.C.G.A. § 9-10-91 governing torts is co-extensive with Fourteenth Amendment). The court considers two factors when determining if asserting personal jurisdiction over nonresident defendants would comport with due process: (1) whether the nonresident defendant has purposefully established minimum contacts with the forum, and (2) whether the exercise of jurisdiction would offend traditional notions of fair play and substantial justice. *Id.* (citing *International Shoe Co. v. Washington*, 326 U.S. 310 (1945)).[2]

---

[2]The court notes for the purpose of completeness that Defendants are incorrect when they assert that Georgia courts have "consistently held that commercial telephone and mail contact are insufficient to give rise to personal jurisdiction." *See* Motion to Dismiss, at 13. Rather, in *Innovative Clinical & Consulting Services, LLC v. First National Bank of Ames*, 279 Ga. 672 (2005), relating to subsection 1 of O.C.G.A. § 9-10-91, the Supreme Court of Georgia noted that the "physical presence" of a defendant in Georgia is not required, and a court should not minimize the "intangible contacts" of the defendant with the forum state. *Id.* There, the court remanded the case for the trial court to determine whether it had personal jurisdiction considering the postal and telephone contacts between the defendant and the forum state. *Id.*

To satisfy minimum contacts for the purposes of specific jurisdiction, the contacts must (1) be related to plaintiff's cause of action; (2) involve some act of "purposeful availment" by the defendant of the privileges of the forum; and (3) be such that the defendant should reasonably anticipate being "haled into court there." *Francosteel Corp. v. M/V Charm*, 19 F.3d 624, 627 (11th Cir. 1994).

As an initial matter, the court finds at the very least for the purposes of establishing personal jurisdiction, the actions of Mr. Pope can be attributed to those of Mr. Maslowe and Mr. Lusky. Although Mr. Pope consistently denied there was any agency relationship among Defendants, his factual testimony makes it clear that he signed contracts on behalf of NetBenders, a fact known to Mr. Maslowe and Mr. Lusky. Mr. Pope described himself as NetBenders' Director of Engineering. He received and paid all of NetBenders' bills from WWISP. Mr. Pope described his actions with respect to NetBenders in the first person, indicating his belief that he acted on behalf of NetBenders. Significantly, when he became aware of Plaintiff's investigation, he and Mr. Maslowe and Mr. Lusky decided together to halt their operations.

While Mr. Pope characterizes these activities simply as a business arrangement among friends, the court finds they take on more legal significance than that, and for the purposes of these jurisdictional motions, Mr. Pope has acted as an agent for Mr. Maslowe, Mr. Lusky, and NetBenders such that the court may attribute his actions to the remaining NetBender Defendants. *See Rudo v. Stubbs*, 221 Ga. App. 702, 704 (1996) ("When the purpose of a

13

conspiracy is to commit an intentional tort against Georgia, all of the coconspirators are purposefully directing their activities toward Georgia and should reasonably anticipate being haled into court here."). Therefore, the court considers the activities of all Defendants as a whole in determining whether they made sufficient contacts with Georgia to warrant the exercise of personal jurisdiction.

Defendants attempt to focus the court's attention on (1) "unsolicited" e-mail only and (2) the initial dial-up process of obtaining access to the EarthLink accounts. The court declines to cabin the jurisdictional analysis to these items only. A significant portion of the allegations raised in Plaintiff's complaint and the testimony given by Ms. Youngblood at the jurisdictional hearing concerned Defendants' actions after the initial sign-in authentication process has been completed, including the alleged use of a "dynamic DNS" system. That is, Defendants made their web sites appear as if they were hosted by EarthLink's IP address which is located at EarthLink's network in Georgia. Further, Ms. Youngblood explained that Defendants also employed an "asynchronous route" whereby once in the EarthLink system, acting as a "sender" of e-mails, it would mask itself as the originator of those e-mails and cloak the message so as to make it appear it was originating from EarthLink. This process of masking involved connections to and from EarthLink's network in Georgia. Thus, even if the parties have presented conflicting testimony about whether the authentication process that takes place as part of the initial sign-in of a subscriber to the EarthLink network via the RADIUS system actually reaches into Georgia, Plaintiff has alleged substantial other activity

within EarthLink's Georgia network that Defendants have not disputed. Thus, the court concludes that Plaintiff has presented sufficient evidence under its "electronics contact" theory to establish personal jurisdiction over Defendants in Georgia.

Even if the court were not to find sufficient contacts above, the court also agrees that under *Calder v. Jones*, 465 U.S. 783 (1984), Plaintiff has also demonstrated that Defendants' actions have had sufficient "effects" in Georgia so as to allow the exercise of personal jurisdiction. In *Calder*, the actress Shirley Jones filed a libel action against a Florida reporter and his publication. The Supreme Court found that California was the focal point of the article and the harm to Ms. Jones and her reputation. *Id.* at 785. The Court further stated:

> [The] petitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at [the forum]. . . . And they knew that the brunt of that injury would be felt by respondent in the [forum]. . . . An individual injured in [the forum] need not go to [the nonresident's state] to seek redress from persons who, though remaining in [their state], knowingly caused the injury in [the forum].

*Id.* at 788. *Calder* has been described as an "effects test" for intentional torts aimed at the forum state.

Defendants aver that *Calder* is distinguishable because Plaintiff has not identified any single specific instance of unsolicited mailings made by Defendants using EarthLink accounts. The court finds that this is not the proper focus of the inquiry. Rather, what Plaintiff alleges is that Defendants essentially "hijacked" the EarthLink network both by using EarthLink accounts to send e-mail but also to disguise the origins of the advertisements, as well as the

15

e-mails, as coming from EarthLink. Thus, the focus of the tort alleged is on the burden Defendants' alleged spam ring took on the EarthLink network, as well as the harm Defendants' actions caused to EarthLink's existing business. Like the professional reputation of Shirley Jones in California, these harms would impact EarthLink in Georgia. Plaintiff alleges that Defendants likely sent in the neighborhood of eight billion e-mails prior to the shutdown of their operations. It is not difficult to comprehend the impact of such an operation on EarthLink's business with respect to (1) its own customers, (2) customers of other ISPs who (due to Defendants' masking efforts) believed they were being blasted with spam sourced from EarthLink itself, and (3) its business relationship with other ISPs who complained to EarthLink that spam from EarthLink was overburdening the capacity of their own systems.[3]

Finally, the court notes that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice. Under the allegations raised in Plaintiff's complaint, Defendants chose to use EarthLink as the vehicle for their advertising operation.

---

[3] For these reasons, the court finds unpersuasive Defendants' assertion that only a portion of these e-mails was unsolicited. Plaintiff has asserted causes of action under federal civil RICO laws; the Electronic Communications Privacy Act; the Computer Fraud and Abuse Act; the Lanham Act, including unfair competition and dilution of famous mark; Georgia civil RICO law; Georgia Computer Systems Protection Act; Georgia unfair competition; deceptive trade practices; misappropriation of computer resources; conversion; trespass; and unjust enrichment. Defendants have not asserted that all of these causes of action fail if Defendants can show their e-mails were not unsolicited. Furthermore, the manner in which Plaintiff's complaint asserts that Defendants undertook to hide the origins of their actions belies an assertion that the e-mails were not spam. Thus, the court finds it may look to the totality of Defendants' actions to determine the propriety of personal jurisdiction.

AO 72A
(Rev.8/82)

As the court explained above when analyzing the "effects" test, this decision severely impacted EarthLink, a company headquartered in Georgia with a network located in Georgia. The court finds that it not inappropriate to call the alleged tortfeasor to answer for these allegations in Plaintiff's forum. As such, the court DENIES Defendants' motion to compel arbitration [119-1] and DENIES Defendants' motion to dismiss [119-2].

### B.    Andy Pope

As the court explained above, Defendant Andy Pope is proceeding *pro se* in this litigation. On October 20, 2005, he answered Plaintiff's Second Amended Complaint. In his answer, Defendant Pope still appears to contest the jurisdiction of the court. For example, Defendant Pope states that he does not believe he signed an Internet Service Agreement when he registered accounts with EarthLink. He also states that he used his dial-up account to call local numbers in Birmingham, Alabama. Defendant Pope asserts that Defendants' e-mails were not sent through EarthLink's Georgia e-mail servers because Defendants' computers were not in Georgia. Defendant Pope refers to a conversation he apparently had with an EarthLink customer service representative who informed him that all phone calls remain in the state in which they originated and do not go to Georgia unless the subscriber lives in Georgia. He further asserts that his Alabama dial-up account could not go to EarthLink's computers in Georgia because the "phone costs would be prohibitive."

On November 21, 2005, Defendant Pope filed a brief concerning the issue of personal jurisdiction. In this brief, Defendant Pope avers that he never personally signed up for an

17

EarthLink account, but rather accounts were supplied to him by Mr. Avore. He filed an amended motion to dismiss on December 13, 2005, in which he reiterates his previous arguments.[4]

EarthLink responds that because Plaintiff filed an answer to its Second Amended Complaint, he has waived his objection to this court's exercise of personal jurisdiction. While Plaintiff is correct that after the completion of jurisdictional discovery, the parties and the court had contemplated either Defendants answering Plaintiff's amended complaint or filing a second motion to dismiss for lack of personal jurisdiction, and Defendant Pope did file an answer to Plaintiff's complaint, it is clear from Defendant Pope's answer and his subsequent filings that he continues to object to the court's exercise of personal jurisdiction. Considering that Defendant Pope is proceeding *pro se*, the court finds that Defendant Pope

---

[4]Defendant Pope also refers to conversations he and Plaintiff's counsel have had concerning whether Plaintiff's counsel did or did not tell Defendant Pope that Plaintiff would not file suit if the spam e-mails stopped. Whether this conversation did or did not take place or whether Defendant Pope has an accurate recollection of the conversation is of no moment to this litigation, particularly whether this court has personal jurisdiction. Nor has Defendant Pope articulated any circumstances that would impose any kind of legal obligation on Plaintiff's counsel for whatever might have been spoken. Defendant Pope also expresses some concern as to the nature of discovery sought from him by Plaintiff. If Defendant Pope believes the discovery requests propounded by Plaintiff are broad or burdensome, such concerns are more properly addressed in a motion for a protective order under Federal Rule of Civil Procedure 26, rather than a motion for sanctions. For these reasons, the court DENIES Defendant Pope's motion for sanctions [134-1]; DENIES AS MOOT Plaintiff's motion to strike Defendant Pope's motion for sanctions [135-1]; and DENIES Defendant Pope's amended motion for sanctions [141-1].

AO 72A
(Rev.8/82)

has not waived this defense.[5] However, for the same reasons as stated above, the court finds Plaintiff has proffered sufficient evidence for the court to exercise personal jurisdiction over Defendants, including Mr. Pope. As such, the court DENIES Defendant Pope's amended motion to dismiss [133-1] and DENIES Plaintiff's motion to strike Defendant Pope's motion to dismiss [136-1].

### III.  Conclusion

The court DENIES Defendants' motion to compel arbitration [119-1]; DENIES Defendants' motion to dismiss [119-2]; DENIES Defendant Pope's amended motion to dismiss [133-1]; DENIES Defendant Pope's motion for sanctions [134-1]; DENIES AS MOOT Plaintiff's motion to strike Defendant Pope's motion for sanctions [135-1]; DENIES Plaintiff's motion to strike Defendant Pope's motion to dismiss [136-1]; and DENIES Defendant Pope's amended motion for sanctions [141-1].

Defendants Lusky, Maslowe, NetBenders, and ISN are DIRECTED to file an answer to Plaintiff's Second Amended Complaint within twenty (20) days from the date of this order.

**IT IS SO ORDERED** this 31st day of August 2006.

---

[5] Plaintiff appears to argue that because Defendant Pope allegedly has monetary means and has "voluntarily" chosen to represent himself, the court should not give deference to his status as a *pro se* litigant. Neither *Hudson v. Hardy*, 412 F.2d 1091, 1094-95 (D.D. Cir. 1968), nor *United States v. Pinkey*, 548 F.2d 305, 311 (10th Cir. 1977), cited by Plaintiff, supports this proposition.

                                              <u>    s/ J. Owen Forrester    </u>
                                                     J. OWEN FORRESTER
                             SENIOR UNITED STATES DISTRICT JUDGE